[No. A128865. First Dist., Div. Five. Dec. 22, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
MASALA MAJID JAMES, Defendant and Appellant.

## Counsel

Walter K. Pyle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, René A. Chacón and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BRUINIERS, J.**—Appellant Masala Majid James was charged with commission of a second degree robbery (Pen. Code, § 211)[1] and elected to represent himself during pretrial proceedings. James contends that he was compelled to waive his right to represent himself at trial because he was refused direct access to a law library while in custody and was provided insufficient access to legal research materials, in violation of his federal constitutional rights. Represented by counsel reappointed at his request, James was convicted and sentenced to 18 years in prison. We affirm.

### I. Background

James was charged, by information, with one count of second degree robbery (§ 211). The information also alleged that James had 14 prior convictions, seven of which were prior serious felony convictions (§ 667, subd. (a)(1)), and also constituted "strikes" (§§ 667, subd. (e)(2), 1170.12, subd. (c)(2)). The information further alleged that James had served three prior prison terms (§ 667.5, subd. (b)).

Before the case went to trial, the trial court (Hon. Robert Kurtz) noted there was no suggestion that James had displayed a weapon during the robbery and indicated its willingness to strike all but one of James's strike priors, if James would waive his right to a jury trial. James agreed to do so.

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

James does not challenge the sufficiency of the evidence supporting his convictions. Thus, we recite the operative evidence, presented at the bench trial, only for context.

*Prosecution's Case*

On September 28, 2007, the Washington Mutual bank branch near the Stoneridge Mall, in Pleasanton, was robbed. At the time, James worked for the Salvation Army picking up donations in Bay Area cities, including Pleasanton.

On September 28, 2007, James was assigned to work with Patrick Worrell-Facey. Worrell-Facey testified that he remembered a day, in September 2007, when he and James traveled to Pleasanton to pick up donations. During their lunch break, at James's suggestion, they stopped and parked in the lot of a Pleasanton shopping mall. James changed into "[d]esert army fatigue clothes," including boots and a hat, inside the Salvation Army truck. James then left while Worrell-Facey stayed in the truck to sleep.

That same day, Farhan Mohsin, the assistant manager of the Pleasanton branch of Washington Mutual bank, greeted an African-American man, wearing a camouflage uniform and hat, who entered the bank between 1:00 and 1:30 p.m. The man proceeded to a teller window. The teller at the window was Reena Stroman. Stroman testified that, between 1:00 and 1:30 p.m., a tall African-American man wearing a light army camouflage shirt, told her: " 'Don't look around. Listen, this is a robbery case. I have a weapon. I'll shoot you if you do. Give me all the big bills you have.' " Stroman handed over all the $50 and $100 bills she had in her "working drawer." After being told to empty the drawer, Stroman handed over the rest of the money she had in her working drawer—about $1,500 to $1,600 total. The man put the cash in his pocket and told Stroman to open up a second drawer. She then gave him all of the money in that second drawer—between $4,000 and $5,000. After placing the money from the second drawer in his pocket, the man told Stroman, " 'Thank you ma'am. Have a good day.' " He then exited the bank. Stroman pressed her silent alarm and police were provided with photographs of the robber from surveillance tapes. Both Mohsin and Stroman later identified James as the robber.

Worrell-Facey woke from his nap when he heard James return to the truck. James still had on the same "desert army fatigue clothes." As Worrell-Facey drove away from the mall, James changed back into the clothes he had been wearing that morning and started counting money.

*Defense Case*

A witness who stood behind the robber in line testified that he did not believe James was the robber. He stated: "the robber was a lot lighter skinned. [¶] . . . [¶] . . . And he had a skinnier face."

The court found James guilty of second degree robbery and found all prior-conviction allegations true. At sentencing, the trial court struck all but one of James's "strike" priors, on its own motion pursuant to section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628].[2] James was sentenced to 18 years in prison. This timely appeal followed.

## II. DISCUSSION

James contends that his Sixth Amendment right to self-representation was violated because, when he represented himself before trial, he was denied personal access to a law library. He claims that he was limited to the use of a "paging" system, which provided only legal materials specifically requested. James further contends that, by denying him direct personal access to a law library, the trial court "compelled" him to relinquish his in propria persona status, further violating his right to self-representation under the Sixth Amendment to the federal Constitution.[3] James's claims are without merit.

■ "A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive. A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution. (*United States v. Wade* (1967) 388 U.S. 218, 223–227 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gideon v. Wainwright* (1963) 372 U.S. 335, 339–345 [9 L.Ed.2d 799, 83 S.Ct. 792]; *Powell v. Alabama* (1932) 287 U.S. 45, 71 [77 L.Ed. 158, 53 S.Ct. 55].) At the same time, the United States Supreme Court has held that because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the

---

[2] The court stated: "I'm unwilling to *Romero* all of [the prior convictions.] That would be inappropriate given Mr. James's extensive criminal history. [¶] However, [the ninth through 14th prior convictions] were not brought and tried separately, they are from some time ago, and, as has been noted, there's no indication of any use of any firearm or dangerous or deadly weapon . . . in any of the incidents."

[3] We need not address whether James was also deprived of his rights to a speedy trial and equal protection. In his opening brief, James only raises these issues in passing and includes no reasoned analysis. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481] [if no legal argument with citation to authority " 'is furnished on a particular point, the court may treat it as waived, and pass it without consideration' "]; *Levin v. Ligon* (2006) 140 Cal.App.4th 1456, 1486 [45 Cal.Rptr.3d 560] ["[i]t is elementary that points raised for the first time in a reply brief are not considered by the court"].)

right to represent himself or herself. (*Faretta v. California* [(1975)] 422 U.S. 806, 819 [45 L.Ed.2d 562, 95 S.Ct. 2525] . . . .)" (*People v. Marshall* (1997) 15 Cal.4th 1, 20 [61 Cal.Rptr.2d 84, 931 P.2d 262].)

In *Faretta*, the United States Supreme Court declared that a defendant "must be free personally to decide whether in his particular case counsel is to his advantage," even though "he may conduct his own defense ultimately to his own detriment . . . ." (*Faretta v. California, supra*, 422 U.S. at p. 834 (*Faretta*).) Thus, a state may not "constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense." (*Id.* at p. 807.) " 'Erroneous denial of a *Faretta* motion is reversible per se. [Citation.]' [Citation.] The same standard applies to erroneous revocation of pro. per. status. [Citation.]" (*People v. Butler* (2009) 47 Cal.4th 814, 824–825 [102 Cal.Rptr.3d 56, 219 P.3d 982]; see also *McKaskle v. Wiggins* (1984) 465 U.S. 168, 177, fn. 8 [79 L.Ed.2d 122, 104 S.Ct. 944] ["[s]ince the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis"].)

## A. *Procedural Background*

Although the record is incomplete on this issue, it appears that James made a successful motion for self-representation, pursuant to *Faretta*, sometime in December 2007. Thereafter, James represented himself at the preliminary hearing and throughout extensive pretrial proceedings. During this time, James filed numerous pretrial motions, including a motion to dismiss prior convictions and a motion to set aside the information.

On December 9, 2008, James, who was in custody throughout these proceedings, filed a motion seeking an order directing the Alameda County Sheriff's Office to provide him escorted access to the county law library. In support of that motion, he submitted, as an exhibit to his declaration, a copy of a "Legal Information Request" form. That form includes a space for the inmate to designate five items that he or she wants to receive. It also states: "In the information request blank lines at the bottom of the form you may ask for specific cases or code sections, and/or general information about a topic that concerns you. [¶] If you want a specific case, please provide as much information as you can such as case name, citation and year of decision. For example, People vs. Smith, 1 C.A. 4th 233, (1977). [¶] If you want to see a particular law or statute, you may ask for it by a specific reference such as Penal Code section 415, or by subject such as 'Laws or Code sections about disturbing the peace.' [¶] If you want to read general information about a

topic that concerns you, ask for information by naming the topic such as <u>parole violations, probation, divorce, child custody, etc.</u>" (Some capitalization omitted.).

The sheriff's office opposed the motion, arguing that cost and security interests preclude it from personally escorting James, or any other inmate, to a law library. They also argued that James was nonetheless provided constitutionally adequate access to legal resources. A declaration in opposition to James's motion was provided from Richard Williams, an attorney who owns Legal Research Associates (LRA). Williams and his staff, consisting of paralegals and trained research assistants, provide legal research assistance to inmates housed in Alameda County's jails.

Williams, in his declaration, described the services provided by LRA:

"6. The LRA program operates as follows:

"a. An inmate wanting legal research materials completes a Request Form available in the housing units.

"b. The Request Forms are collected daily by jail staff, logged in there, and then sent by Fax transmission to the office of LRA.

"c. The Request Forms are logged in at LRA to show date of receipt and prioritized for *pro per* inmates and other inmates having immediately impending court dates.

"d. LRA staff then collects information responsive to each inmate's Requests and inserts that information into unsealed envelopes addressed to the inmate. (These envelopes are unsealed to allow easy inspection by jail personnel to ensure that nothing improper is being sent to the inmates.)

"e. Each day the completed responses are bundled and sent by overnight courier to the county jails. The date each response is returned is logged to establish a record of the time taken by LRA to complete each response. [¶] . . . [¶]

"10. The legal resource materials, books and periodicals that are available for LRA to use in responding to inmate requests rival the materials, books and periodicals that are available in the best law libraries in California. LRA maintains substantial electronic subscriptions with Lexis Nexis and Westlaw that enable provision of on-point research material on virtually any issue that an inmate might have. The resources are the most current available. Our electronic library includes all California statutes and cases as well as statutes

and cases from all other states, federal statutes and cases, the full Witkin Library, California Jurisprudence, American Jurisprudence, ALR, California Forms of Pleading and Practice (civil), California Criminal Defense Practice, the full Rutter Group publication, California and federal jury instructions, and numerous other state and federal secondary sources. We also have access to forms on the California Judicial Council website, as well as other on line resources.

"11. An inmate who knows which cases, code sections, or sections from various secondary sources she/he wishes to review can obtain them by referring to them by citations. Cases can be obtained by all or a portion of a case name. LRA staff will do a very thorough search, even including altering the spelling of a case name, in an effort to locate a case requested by an inmate. Only after an exhaustive search will LRA send a memo to an inmate advising that we were unable to locate a requested item.

"12. To assist inmates who are frequently unacquainted with or untrained in legal research LRA has developed and compiled approximately 500 topical information packets containing information on subjects that inmates frequently ask about. . . .

"13. These packets enable an inmate to obtain extensive information on a topic of interest without knowing the technical name of a procedure or subject, a specific code section, or a specific research resource. For example, using plain English an inmate can obtain information on homicide or robbery or bail without knowing specific code sections. These packets typically include statutes, text from recognized secondary sources such as Witkin or Cal Jur and, where appropriate, either forms or examples of forms. Packets dealing with specific offenses include standard jury instructions. . . .

"14. Our criminal packets include packets pertaining to criminal procedural issues. For example, there are packets for motions to set aside an information . . . , to suppress evidence . . . , for a speedy trial, to strike priors, a Marsden motion, and preliminary hearings to name a few. There are packets that address sentencing, enhancements, defenses, and writs of habeas corpus, mandamus and prohibition, and civil rights complaints.

"15. Motions and procedural packets include sample motion forms including points and authorities and textual information from treatises such as Witkin and/or Criminal Defense Practice that discuss the procedural format and substantive basis of the motion and/or procedural issue. These secondary sources provide extensive references to cases and statutes relevant to the issue in question. [¶] . . . [¶]

"22. . . . Once the inmate has a topical packet, he/she can request specific cases, ALR citations, annotated statutes, and/or Shepardization treatment of a

citation. In response to Shepardization requests, LRA currently provides the inmate results in the format utilized by West Key Cite that includes information concerning treatment of the case in subsequent decisions."

Denying James's motion, the court (Hon. Kevin Murphy) stated: "It doesn't appear to me that either from your own mind and your own intelligence combined with the access that you have through LRA . . . that you have any problem in bringing it to the attention of this Court the motions that you want to make, the ideas that you have, or the things that you're trying to accomplish. [¶] . . . I haven't counted the number of cases that you cited, the number of Rules of Court that you've cited, the number of quotes that you have from cases, but it's a lot, and I've spent a lot of time reading the papers that you've filed. [¶] I don't feel I'm in a position of dealing with someone who has simply run into a cement wall and been denied access to or denied the ability to research to read and write and present arguments to the Court."

Trial was scheduled to begin on March 9, 2009. In January 2009, James submitted a motion for a continuance, arguing that he needed more time to prepare a defense because he was limited in his ability to conduct legal research. Judge Murphy granted the motion and set June 1, 2009, as the new trial date. On May 15, 2009, James filed another motion for continuance, raising essentially the same argument. This motion was denied. On June 1, 2009, James asked to be represented by a deputy public defender. James noted, at the time, that he had sought unsuccessfully to continue representing himself with appointment of advisory counsel. The trial date was continued and a deputy public defender thereafter appeared as James's counsel.

In April 2010, James's appointed counsel filed a motion requesting dismissal of the information on the grounds that James's "6th Amendment right to represent himself was sabotaged by the limitations placed on his opportunity to do legal research, the limitation on possessing CD's in jail that resulted in his having to do his preliminary hearing without access to recorded witness statements, and the denial of his timely request for a continuance of his jury trial that resulted in his being forced to give up his right to represent himself [in] order to protect his right to effective assistance of counsel." In a declaration submitted in support of that motion, James stated: "Alameda County does not have a law library available to its jail inmates. Instead, it has a system that requires inmates to put in requests for legal materials. [¶] . . . That system does not give inmates a viable opportunity to do real legal research. It requires the inmate to be able to know what to write on a 'Legal Information Request' form in order to get it. This requirement that one must know in advance what the potential legal issues may be before being able to research any issues creates a great risk that many

viable legal issues will be missed by inmates invoking their right to defend themselves. [¶] . . . I needed to repeatedly delay my case because the process of having to guess what cases I needed and then wait for the requested cases to be provided to me was so slow and cumbersome."

James's declaration also provided: "On June 1, 2009, I again requested a continuance. It was denied and I was sent to a trial court. When I made my request for a continuance in the trial court, I was told I would have to start picking a jury on Wednesday June 3 whether I was ready or not, and that the only way to avoid that would be to ask that a Public Defender be appointed to represent me. [¶] . . . Given a choice of either waiving my Constitutional right to represent myself, or my Constitutional right to effective assistance of counsel, I agreed to waive my right to represent myself. I did not want to give up this right, and feel that I had no choice because the inadequate resources that had been provided to me had made it impossible to be ready and prepared for trial at that time."[4]

At the hearing on the motion, Williams testified regarding the legal research services provided by LRA to jail inmates. Williams testified that James submitted more than 59 requests for materials. LRA complied with each of James's requests within two working days, as mandated by the Alameda County contract.

Judge Kurtz denied James's motion to dismiss, providing the following reasoning: " '[T]he crucial question underlying all [of] defendant's constitutional claims is whether he had reasonable access to the ancillary services that were reasonably necessary for his defense.' [¶] That, I believe, states the law as it exists at this point. Whether or not there is reasonable access. Not absolute access, not access to all that a defendant may wish to have, but rather whether there is reasonable access. [¶] The idea that in-custody inmates would be escorted to the county law library so they can do their legal research, presumably if they're in custody they would have to be accompanied by deputies, to be blunt, strikes me as a bit absurd. That is not in any way a reasonable possibility. [¶] . . . [¶] Now, personally I think this is an interesting issue. The United States Supreme Court has ruled in *Faretta* . . . that defendants have a right to represent themselves. And I think that . . . overwhelmingly, people are going to realize that someone who's representing himself or herself needs to have access to legal materials. [¶] I think it's also fair to say that given the times we live in, it is naïve to think that resources are unlimited and it is naïve to think that many of our governmental bodies are going to try to comply with the constitutional requirements, but with the

---

[4] In his declaration, James also stated that he was delayed in his ability to listen to recorded witness statements and was denied assistance with respect to interviewing and subpoenaing witnesses. He does not renew these complaints on appeal.

lowest use of resources that can be provided. [¶] . . . [¶] . . . I have reviewed much of the court file, it is in two large volumes. There have been a multitude of motions and requests that have been made. And looking at it, and looking at what's provided, and listening to Mr. Williams, it does appear to me that the system provided by Alameda County, in fact, complies with the constitutional mandate. It is not perfection, but perfection is not required."

## B. *Analysis*

James's argument, as we understand it, is that his decision to proceed with appointed counsel was coerced because he faced an unconstitutional alternative: proceeding pro se with insufficient access to the legal research materials required to prepare his defense. We thus first consider whether James's constitutional rights were violated by the fact that he lacked direct access to a law library.

■ The United States Supreme Court has never ruled on the extent to which the government must provide a criminal defendant, who decides to waive counsel and represent himself, access to a publicly funded law library. (*Kane v. Garcia Espitia* (2005) 546 U.S. 9, 10 [163 L.Ed.2d 10, 126 S.Ct. 407].) Some federal circuit courts have held that "[w]hen a prisoner voluntarily, knowingly and intelligently waives his right to counsel in a criminal proceeding, he is not entitled to access to a law library or other legal materials." (*U.S. v. Cooper* (10th Cir. 2004) 375 F.3d 1041, 1052.) But, the California Supreme Court has recognized that the right to self-representation, guaranteed by the Sixth Amendment, " 'includes, and indeed presumes, the right to effective counsel [citations], and thus also includes the right to reasonably necessary defense services. [Citations.]' [Citation.]" (*People v. Blair* (2005) 36 Cal.4th 686, 732 [31 Cal.Rptr.3d 485, 115 P.3d 1145].) Thus, "[i]t is certainly true that a [self-represented] defendant . . . may not be placed in the position of presenting a defense without access to a telephone, law library, runner, investigator, advisory counsel, or any other means of developing a defense [citation] . . . ." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1040 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) However, "this general proposition does not dictate the resources that must be available to defendants. Institutional and security concerns of pretrial detention facilities may be considered in determining what means will be accorded to the defendant to prepare his or her defense. [Citations.]" (*Ibid.*) Inmates do not have "an abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law

library or legal assistance program is subpar in some theoretical sense." (*Lewis v. Casey* (1996) 518 U.S. 343, 351 [135 L.Ed.2d 606, 116 S.Ct. 2174].)[5]

█ "[D]epriving a self-represented defendant of 'all means of presenting a defense' violates the right of self-representation. [Citation.]" (*People v. Blair, supra,* 36 Cal.4th at p. 733.) However, "[i]n the final analysis, the Sixth Amendment requires only that a self-represented defendant's access to the resources necessary to present a defense be reasonable under all the circumstances. [Citation.] [¶] Thus, the crucial question . . . is whether [a defendant] had reasonable access to the ancillary services that were reasonably necessary for his defense." (*Id.* at pp. 733–734.) To be entitled to a reversal, a defendant must show both error and resulting prejudice. (*Id.* at p. 736.)

█ As both Judge Murphy and Judge Kurtz correctly concluded, James was provided "reasonable access" to the services reasonably necessary for his own defense. (*People v. Blair, supra,* 36 Cal.4th at p. 734.) We reject James's contention that the Alameda County jail provides only a "paging" system for access to legal research materials. It does not. "A paging system allows a prisoner to request specific volumes. The significant features of such a system are that the prisoner must know in advance which volumes he will need to review and that the process of ordering and returning books drastically prolongs legal research." (*Toussaint v. McCarthy* (9th Cir. 1986) 801 F.2d 1080, 1109, fn. 30 (*Toussaint*).)

We agree with James that it is unrealistic to expect lay persons to "perform legal research effectively by having to designate in advance which pages of a law book are needed, and then designating other pages as a result of reviewing the first designation." For this reason, some true "paging" systems

---

[5] James also relies on *Bounds v. Smith* (1977) 430 U.S. 817 [52 L.Ed.2d 72, 97 S.Ct. 1491] (*Bounds*). In *Bounds,* the United States Supreme Court held that the "fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries *or adequate assistance from persons trained in the law.*" (*Id.* at p. 828, italics added.) The United States Supreme Court has since made clear that *Bounds* did not establish "an abstract, freestanding" constitutional right to a law library, per se. (*Lewis v. Casey, supra,* 518 U.S. at pp. 350–351.) Thus, it is not enough for an inmate to establish that he was denied access to legal materials; rather, an "inmate . . . must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." (*Id.* at p. 351.) The court also wrote: "It must be acknowledged that several statements in *Bounds* went beyond the right of access recognized in the earlier cases on which it relied, which was a right to bring to court a grievance that the inmate wished to present, [citations]. These statements appear to suggest that the State must enable the prisoner to *discover* grievances, and to *litigate effectively* once in court. [Citation.] These elaborations upon the right of access to the courts have no antecedent in our *pre-Bounds* cases, and we now disclaim them." (*Lewis v. Casey,* at p. 354.)

have been condemned as violating the federal Constitution. (*Toussaint, supra,* 801 F.2d at pp. 1109–1110.) However, the "paging" system at issue in *Toussaint* was *limited* to advance designation of specifically identified research materials, and permitted an inmate to order only five books per week, which would then be delivered to his or her cell. (*Id.* at p. 1109.) In *Toussaint,* a case involving convicted prison inmates rather than pretrial detainees, the court held that meaningful access to the courts required that a prisoner either be provided with reasonable access to a law library *or* the state must provide that prisoner legal assistance. (*Id.* at p. 1110.)

■ The record here shows that James had access, through trained legal research assistants at LRA, to a comprehensive list of legal materials, including treatises and informational pamphlets. James's requests for legal materials were not limited in number and were directed to experienced professionals, who could provide guidance in his research if he did not have the citation to a specific case or statute. To this point, Williams's declaration provided that, "[i]f any LRA staff member has a question about how to answer an inmate's information request, she/he discusses it with the certified paralegal and/or with me. Together we decide what material best responds to the inmate's request." James could also obtain topical information pamphlets simply by naming a topic, which would then enable him to request specific cases, annotated statutes, additional secondary source material, and Shepardization treatment of a citation. In our view, the services provided by LRA would reasonably satisfy a legal researcher's need to " 'brows[e] through various materials in search of inspiration . . . .' " (*Toussaint, supra,* 801 F.2d at p. 1110.)

There is nothing in the record that shows James was denied access to any particular legal research material, that LRA failed to fully satisfy any request which James made, or that he was in any way limited in his ability to represent himself effectively when he was in pro se status. In fact, the record shows that, during the year and a half that James represented himself, LRA responded to approximately 80 separate requests which he made for materials. And, while representing himself, James filed numerous pretrial motions, including a motion to dismiss prior convictions and a motion to set aside the information. All of his motions contained citations to what appears to be appropriate legal authority.

It is certainly possible that the pace of James's legal research was slower than it would have been had he direct access to a law library. It is equally possible, if not probable, that the research done on James's behalf by the experienced professionals of LRA was more productive and focused than had he attempted the research directly. The trial court granted James's initial request for a continuance and there is nothing in the record that shows James

needed a further continuance of trial because he had been unable to complete research on any particular issue during that year and a half. James's motion for a continuance of the June 1, 2009 trial date merely made a generalized claim that he needed more time to prepare his defense. We cannot say, on this record, that James was denied reasonable access to the services necessary to present a defense.

 Other Ninth Circuit authority does not persuade us to reach a different result. In *Milton v. Morris* (9th Cir. 1985) 767 F.2d 1443 (*Milton*), the pro se defendant went to trial without counsel or an investigator, and without access to legal assistance, current law books, or a telephone. (*Id.* at pp. 1444–1445.) The reviewing court said: "The question thus becomes whether Milton's due process rights were violated when he was tried without having had any meaningful opportunity to prepare his defense. We hold, *in the circumstances of this case*, that they were. Despite timely and reasonable requests, Milton was isolated from *any means* to prepare. . . . [¶] . . . [¶] We need not determine in this case whether *Bounds*[, *supra*,] 430 U.S. 817 . . . , which involved an unrepresented prisoner seeking collateral review of his conviction, should be interpreted as placing an affirmative duty upon the state to provide a library for the defendant who has rejected the assistance of counsel for trial. *Faretta* controls this case. [¶] *Faretta* holds that the rights guaranteed by the sixth amendment are personal to the accused. 'The rights to notice, confrontation, and compulsory process' mean, at a minimum, that time to prepare and *some access* to materials and witnesses are fundamental to a meaningful right of representation. [Citations.]" (*Milton, supra,* 767 F.2d at pp. 1445–1446, italics added, fn. omitted.)

Unlike the defendant in *Milton*, James does not assert that he was denied access to a telephone, an investigator, or all legal materials during the period that he represented himself, or that he was threatened with loss of such access if he continued in pro se status. Even assuming that his ability to conduct legal research may have been slowed, James was not denied the means to reasonably conduct a defense.

Nor are we convinced, as James argues, that a pro se defendant *must* be appointed advisory counsel if he does not have personal access to a law library.[6] In making this argument, James cites *People v. Moore* (2011) 51 Cal.4th 1104 [127 Cal.Rptr.3d 2, 253 P.3d 1153] (*Moore*). But, *Moore* established no such rule.

In *Moore*, our Supreme Court considered the automatic appeal of a capital defendant, who had represented himself during pretrial proceedings and

---

[6] James does not separately argue that the trial court abused its discretion in denying his request for advisory counsel.

during portions of the guilt phase of trial. (*Moore, supra,* 51 Cal.4th at pp. 1111–1112 & fn. 1.) The defendant's in propria persona privileges had been revoked near the start of trial, after the defendant had been found in possession of a sharpened rod taken from a typewriter he had used at the jail's law library. As a result, he no longer had access to the law library, but only to a legal runner who could provide requested legal materials. (*Id.* at pp. 1124, 1126.) In considering whether the defendant's constitutional rights had been violated, the court recounted the "reasonable access" principle announced in *Blair* and *Jenkins*.[7] (*Moore, supra,* 51 Cal.4th at pp. 1124–1125.) Our Supreme Court held that Moore had been provided with reasonable resources necessary to present a defense, because he had been provided with advisory counsel, an investigator, and a legal runner. (*Moore, supra,* 51 Cal.4th at p. 1126.) The court said: "despite restrictions on the defendant's own access to defense resources, '[w]hen the defendant has a lawyer acting as advisory counsel, his or her rights are adequately protected.' [Citation.]" (*Ibid.,* fn. omitted.) The court concluded: "defendant was not denied reasonable resources necessary to present his defense under all the circumstances of this case, nor, to the extent he claims so on appeal, can we

---

[7] The *Moore* court also observed: "In stating this rule in *Jenkins*, we cited *Milton*[, *supra*,] 767 F.2d [at pages] 1445–1446 . . . . (*Jenkins, supra,* 22 Cal.4th at p. 1040; see also *Taylor v. List* (9th Cir. 1989) 880 F.2d 1040, 1047 . . . [describing *Milton* as holding 'that the Sixth Amendment right to self-representation recognized in *Faretta* includes a right of access to law books, witnesses, and other tools necessary to prepare a defense'].) We note that other courts have reached conclusions seemingly at odds with *Milton* concerning the government's duty to provide resources for a defendant who has exercised his or her *Faretta* right. (See, e.g., *U.S. v. Cooper*[, *supra*,] 375 F.3d [at p.] 1052 ['When a prisoner voluntarily, knowingly and intelligently waives his right to counsel in a criminal proceeding, he is not entitled to access to a law library or other legal materials.']; *Degrate v. Godwin* (5th Cir. 1996) 84 F.3d 768, 769; *U.S. v. Smith* (6th Cir. 1990) 907 F.2d 42, 44; *U.S. v. Pina* (1st Cir. 1988) 844 F.2d 1, 5, fn. 1; *U.S. ex rel. George v. Lane* (7th Cir. 1983) 718 F.2d 226, 231 ['the offer of court-appointed counsel to represent a defendant satisfies the constitutional obligation of a state to provide a defendant with legal assistance under the Sixth and Fourteenth Amendments']; see also *U.S. v. Robinson* (9th Cir. 1990) 913 F.2d 712, 717 ['there is nothing constitutionally offensive about requiring a defendant to choose between appointed counsel and access to legal materials; the Sixth Amendment is satisfied by the offer of professional representation alone'].) The United States Supreme Court has recognized that the extent to which the government must provide publicly funded defense services to a self-represented criminal defendant is an open issue in that court's jurisprudence. (*Kane v. Garcia Espitia*[, *supra*,] 546 U.S. [at p.] 10 [noting split of authority in lower courts, and concluding that no clearly established federal law existed for purposes of federal habeas corpus review because '*Faretta* says nothing about any specific legal aid that the State owes a pro se criminal defendant'].) Even to the extent that we might be inclined to revisit our reliance on *Milton*, or to consider whether, if that reliance was misplaced, our state Constitution affords indigent self-represented defendants some higher level of protection than the federal Constitution, we do not do so here because, as discussed further below, defendant has not shown that he was denied reasonable resources necessary to present his defense. [Citation.]" (*Moore, supra,* 51 Cal.4th at p. 1125, fn. 11, italics omitted.)

conclude his decision to accept the appointment of counsel for part of the trial was the result of any unconstitutional interference with his *Faretta* right." (*Id.* at p. 1127.)

■ *Moore* did not hold that the appointment of advisory counsel is constitutionally required in all cases in which a defendant does not have direct access to a law library. *Moore* was a capital case and thus raised a different standard with regard to the appointment of advisory counsel. (See *People v. Bigelow* (1984) 37 Cal.3d 731, 743–746 [209 Cal.Rptr. 328, 691 P.2d 994] [failure to exercise discretion to appoint advisory counsel, in a capital case in circumstances when a refusal to grant the request would be an abuse of discretion, is reversible error per se]; *People v. Garcia* (2000) 78 Cal.App.4th 1422, 1428–1431 [93 Cal.Rptr.2d 796] [trial court has option to appoint advisory counsel in noncapital cases, but its ruling is not subject to appellate review; there can be no abuse of discretion in denying request for advisory counsel in noncapital case].) Capital cases raise complex legal and factual issues that are not necessarily presented in an ordinary felony trial, like James's. Particularly in the circumstances of this case, where the identity of the robber was the only issue at trial, we conclude that James was provided with reasonable resources to conduct his own defense, both before trial, and during trial had he chosen to do so. While James had no advisory counsel or direct access to a law library, he had reasonable access to legal materials and assistance from persons trained in the law. That is all the Constitution requires in these circumstances.

Having concluded that the system for inmate legal research in the Alameda County jail did not unconstitutionally interfere with James's *Faretta* right, we must also reject James's contention that his decision to accept the appointment of counsel, on the eve of trial, was the result of any unconstitutional interference. (See *Moore, supra,* 51 Cal.4th at p. 1127.)

### III. Disposition

The judgment is affirmed.

Jones, P. J., and Needham, J., concurred.

A petition for a rehearing was denied January 20, 2012, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 21, 2012, S199845.