Filed 4/7/16  P. v. Burciaga CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B263517 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA105904) |
| v. | |
| MICHAEL BURCIAGA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Mike Camacho, Jr., Judge.  Affirmed in part, reversed in part, modified, and remanded.

Christopher Nalls, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, David A. Wildman, Deputy Attorney General, for Plaintiff and Respondent.

Following a jury trial, defendant and appellant Michael Burciaga was convicted of two counts of premeditated attempted murder (Pen. Code, §§ 664, 187, subd. (a);[1] counts 1 & 2), shooting at an occupied vehicle (§ 246; count 3), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 4). The jury also found defendant intentionally discharged a firearm in the commission of the offenses charged in counts 1 through 3, and that those offenses were committed for the benefit of a criminal street gang in violation of section 186.22, subdivision (b). It was further determined that defendant had three prior convictions within the meaning of section 667.5, subdivision (b). Defendant was sentenced to consecutive 40-year-to-life terms on counts 1 and 2, plus one year for each prior conviction. The trial court stayed imposition of sentence on counts 3 and 4 pursuant to section 654.

Defendant contends there was insufficient evidence (a) the attempted murders were premeditated, and (b) he had the required intent, i.e., to benefit criminal conduct by gang members, necessary for the gang enhancement. He also maintains the trial court should have denied his request to represent himself because it was "ambiguous and equivocal;" and the court separately erred by shorting him two days of presentence custody credit.

We reverse the portion of the judgment concerning the gang enhancement on the conviction for attempted murder of Edward Campbell (count 1). We also accept the Attorney General's concession that defendant is entitled to two additional days of presentence custody credit and remand the case for the court to modify the judgment to reflect those additional days. In all other respects, the judgment is affirmed.

---

[1]     All statutory references are to the Penal Code.

## FACTS

The Puente Trece gang had numerous cliques. The Blackwood clique wanted to separate from the gang to form its own gang, and this caused internal Puente Trece gang turmoil, including several shootings.

On May 19, 2013, Campbell, an "original" member of the Puente Trece gang and a member of its Perth Street clique, drove a vehicle in La Puente, and picked up Adrian Torres, another member of that gang and a member of the Ballista clique.[2] Campbell offered to give Torres a ride home, but told Torres that Campbell first had to go to the house of Matthew Burciaga,[3] defendant's brother, to obtain "some answers" about the death of "Joker," a Puente Trece gang member who had been shot the night before. Torres knew there was "bad blood" between Campbell and Matthew.

When Campbell and Torres arrived at Matthew's house, there were three people outside, in front of a garage: defendant, Robert Valdivia,[4] and Matthew. Defendant and Valdivia were members of the Puente Trece gang. Matthew was in a wheelchair; he had been a member of the Puente Trece gang, Perth Street clique, until he was shot when he was about 17 years old.

Before getting out of the vehicle, Campbell handed Torres a gun, which Torres placed in the center console. Campbell then told the men who were in front of the garage, "I'm not armed. I just—I just need to ask some questions."

Campbell exited the vehicle and walked toward Matthew, Valdivia, and defendant. Torres remained in the vehicle. Defendant approached Campbell; Matthew and Valdivia remained near the garage. Defendant and Campbell got "close to" one another and

---

[2]    At the time of trial, Torres was attempting to "get out" of the gang.

[3]    Because Matthew Burciaga and defendant share the same surname, we refer to Matthew Burciaga as Matthew. Matthew is sometimes referred to in the record as "Porky."

[4]    Valdivia was also charged in the underlying case, but he is not a party to this appeal.

3

spoke. The conversation led to an argument. Then, Torres heard four or five gunshots, and saw defendant shoot Campbell. Campbell backed up, holding his stomach. Matthew and Valdivia were still near the garage.

Campbell walked toward the vehicle; he was crouched over and holding his stomach. Torres moved from the passenger seat of the vehicle to the driver's seat. Campbell, whose shirt was bloody, entered the passenger seat of the vehicle and asked Torres to take him to a hospital. While the vehicle was still parked, Torres then heard Valdivia yell, "That's his nephew. Get him."[5] Defendant began shooting "at least one shot" at the vehicle. In response, Torres used the gun Campbell gave him to fire one shot at defendant; the gun then "jammed." Torres drove off, and while en route to the hospital, Torres put his hand on Campbell's stomach, trying to hold Campbell's "guts in." From photographic lineups, Torres identified defendant as the person who shot Campbell, and Valdivia as the man who was "behind the shooter."

Los Angeles County Sherriff's Department Detective Carlos Gutierrez, the prosecutor's gang expert, testified the Puente Trece gang had approximately 768 members, and was divided into 16 different cliques. The gang's primary activities included drug sales and shootings (drive-by shootings, walk-up shootings, murders, and assaults with deadly weapons). In 2012, two Puente Trece gang members were convicted of assault with a firearm.

Detective Gutierrez opined the shootings were for the benefit of and in association with Puente Trece, stating: "[T]he way the gang's benefitting from [] this is that, by having shot at this other individual, a member of their own clique, they are promoting or benefitting the gang's reputation of being violent. They are letting everybody know, within their own clique as well as rival cliques that, hey, if we are willing to kill or attempt to kill our own people, we're willing to kill anybody. [¶] In addition to that, with that reputation of being violent comes a cloud of fear. People within the

---

**5**    Torres referred to Campbell as his "uncle" even though they were not actually related.

4

neighborhood are going to be fearful to report this to police, because if they are willing to kill their own gang members, they're willing to kill other people."

**DISCUSSION**

### A.      Substantial Evidence Regarding Premeditation

#### 1.      *Standard of Review*

"'"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citation.]  We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  [Citation.]  In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'  [Citation.]"  (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

Circumstantial evidence and reasonable inferences are included in determining whether there is substantial evidence.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358; *People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.)  In determining whether substantial evidence supports a conviction, "we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses."  (*People v. Little* (2004) 115 Cal.App.4th 766, 771, citing *People v. Jones* (1990) 51 Cal.3d 294, 314.)

#### 2.      *Applicable Law*

"Attempted murder requires (1) a specific intent to kill and (2) a direct but ineffectual act toward accomplishing the intended killing.  [Citation.]  Unlike murder, an

5

attempted murder therefore requires express malice and cannot be proved based upon a showing of implied malice. [Citation.] Also, unlike murder, attempted murder is not divided into degrees. The prosecution, though, can seek a special finding that the attempted murder was willful, deliberate, and premeditated, for purposes of a sentencing enhancement. [Citations.]" (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605.)

"'"[P]remeditation" means thought over in advance. [Citations.] "The process of premeditation . . . does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection.' [Citation.]'" [Citation.]"[6] (*People v. Harris* (2008) 43 Cal.4th 1269, 1286.) "[T]he requisite reflection need not span a specific or extended period of time. Thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly. [Citations.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 213.)

In *People v. Anderson* (1968) 70 Cal.2d 15, the court identified three categories of evidence typically considered when determining if a defendant acted with premeditation and deliberation: planning activity, motive, and the manner of killing. (*Id*. at pp. 26-27.) "*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]" (*People v. Pride* (1992) 3 Cal.4th 195, 247.)

### 3. Analysis

Here, there is evidence of all three *Anderson* factors. Relevant to planning, defendant, while in possession of a gun, approached Campbell, an original member of the Puente Trece gang. After an argument ensued between the two of them, defendant shot

---

**6** For purposes of determining whether sufficient evidence of premeditation exists, there is no distinction between attempted murder and completed murder. (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462-1463, fn. 8, overruled on other grounds in *People v. Mesa* (2012) 54 Cal.4th 191, 199.)

at Campbell. This supports an inference that defendant planned to attack Campbell if their "exchange" did not progress in a manner defendant considered satisfactory.[7]

There was evidence defendant had a motive—here, a gang related motive—for attempting to kill Campbell and Torres. There was a dispute within the Puente Trece gang over the effort of the Blackwood clique to separate from the Puente Trece gang. This caused violent shootings. The jury could reasonably infer this dispute within the gang resulted in the death of one of its gang members the day before the incident, and it appears Campbell believed Matthew had some "answers" as to how that happened. As Detective Gutierrez opined, the shootings benefitted the gang by promoting the gang's reputation for violence and discouraging people in the neighborhood from reporting crimes, particularly since the message here is the gang members are willing to kill their fellow gang members.

Regarding the manner of the shootings, "[T]he method of killing alone can sometimes support a conclusion that the evidence sufficed for a finding of premeditated, deliberate murder." (*People v. Memro* (1995) 11 Cal.4th 786, 863-864.) Campbell visibly disarmed himself, and he said aloud to defendant, "I'm not armed. I just—I just need to ask some questions." Defendant therefore knew Campbell was not a threat.

Campbell was standing very close to defendant when the two began to argue. Defendant fired four or five shots at Campbell at point blank range. The shots perforated

---

[7]      When evaluating the sufficiency of evidence for premeditation and deliberation, the perpetrator's decision to bring a gun to a shooting constitutes evidence of planning. (*People v. Romero* (2008) 44 Cal.4th 386, 401 (*Romero*).) We recognize there is an argument that defendant did not "bring the gun to the shooting" because it was Campbell who sought out defendant. For purposes of assessing sufficiency of the evidence, however, we must view the evidence in the light most favorable to the verdict. (*People v. Edwards, supra*, 57 Cal.4th at p. 715.) In this respect, a rational trier of fact could have concluded that defendant parted from his friends and walked toward Campbell after making the conscious decision to maintain possession of the gun, thus, coming within the confines of *Romero*. Nonetheless, as will be discussed, there was more than enough evidence of the motive and manner of killing to support a finding of premeditation and deliberation notwithstanding the possible infirmities corresponding to the evidence of planning.

Campbell's stomach, resulting in his "guts" falling out. The jury could reasonably infer defendant's manner of shooting Campbell demonstrated a deliberate plan to kill him. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [firing at a vital area at close range supports finding of premeditation and deliberation].)

As to Torres, after defendant shot Campbell and Campbell struggled to return to his car, Torres, with Campbell, attempted to drive away from the scene of the incident. At that point, Valdivia yelled out to defendant, "That's his nephew, get him too." Defendant then attempted to do just that by shooting at Torres. (*People v. Sanchez* (2001) 26 Cal.4th 834, 849 ["Premeditation can be established in the context of a gang shooting even though the time between the sighting of the victim and the actual shooting is very brief"].)

This evidence of planning, motive, and manner of attempting to kill supports an inference the attempted murders were the result of reflection. There was sufficient evidence for a rational trier of fact to find defendant guilty of premeditated attempted murder. Even if the evidence might also "reasonably be reconciled with a contrary finding," reversal would not be warranted. (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)

### B.    Substantial Evidence Regarding Gang Enhancements

#### 1.    *Applicable Law*

To establish a gang enhancement, the prosecutor must prove two elements: (1) the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang," and (2) the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."[8] (§ 186.22, subd. (b)(1).) With respect to the second element, "if substantial evidence establishes that the defendant intended to and did commit the charged felony *with* known members of a gang, the jury

---

[8]    Defendant concedes that the first element was satisfied.

8

may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*People v. Albillar* (2010) 51 Cal.4th 47, 68, italics added.)

### 2.    *Analysis*

The jury found true the gang allegations as to the convictions for attempted murder of Campbell (count 1), attempted murder of Torres (count 2), and shooting at an occupied motor vehicle (count 3). There was insufficient evidence defendant's attempted murder of Campbell was committed with other gang members. Matthew and Valdivia, the other gang members with defendant, were simply at the scene of the incident.[9] There was no evidence Matthew or Valdivia participated in the attempted murder of Campbell.[10]

There however was substantial evidence defendant's attempted murder of Torres, and his shooting at an occupied motor vehicle, were committed with at least one other gang member. Torres, i.e., a self-described nephew of Campbell, was specifically targeted by defendant and his fellow gang member—Valdivia. After defendant shot Campbell, Valdivia yelled, "That's his nephew. Get him." Defendant complied by shooting "at least one shot" at the vehicle as Torres sat in the driver's seat. A rational trier of fact could have concluded it was Valdivia's encouragement that cause defendant to fire toward Torres. There was sufficient evidence defendant committed these offenses with Valdivia thereby satisfying the intent component of the enhancement.

---

[9]    We use the term "at the scene" rather loosely as the record is not specific in this regard. Torres testified, when Campbell exited the car, defendant and Campbell walked toward one another while Matthew and Valdivia "stayed back by the garage." Thus, although Matthew and Valdivia were at the general scene, it appears that they were positioned in a location different from defendant and Campbell when Campbell was shot.

[10]    Notably, although Valdivia was charged in the information with attempted murder of Torres and shooting at a vehicle, neither Matthew nor Valdivia were charged with the attempted murder of Campbell.

9

## C. Granting Defendant's Request to Represent Himself

### 1. *Standard of Review*

"'In determining on appeal whether the defendant invoked the right to self-representation, we examine the entire record de novo. [Citation.]' [Citation.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 932.)

### 2. *Applicable Law*

"'A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive. A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution. [Citations.] At the same time, the United States Supreme Court has held that because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself. [Citation.]' [Citation.]" (*People v. James* (2011) 202 Cal.App.4th 323, 328-329.)

*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) "holds that the Sixth Amendment grants an accused personally the right to present a defense and thus to represent himself upon a timely and unequivocal request. [Citation.] The right to self-representation obtains in capital cases as in other criminal cases [citation], and may be asserted by any defendant competent to stand trial—one's technical legal knowledge, as such, being irrelevant to the question whether he knowingly and voluntarily exercises the right [citations]. The right to representation by counsel persists until a defendant affirmatively waives it, and courts indulge every reasonable inference against such waiver. [Citation.]" (*People v. Dunkle* (2005) 36 Cal.4th 861, 908-909, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

A request for self-representation must be unequivocal. (*People v. Doolin*, *supra*, 45 Cal.4th at p. 453; *People v. Marshall* (1997) 15 Cal.4th 1, 22-23, 27 (*Marshall*).) When determining whether a request for self-representation is unequivocal, "courts must determine 'whether the defendant truly desires to represent himself or herself.'

10

[Citation.] Thus, 'an insincere request or one made under the cloud of emotion may be denied.' [Citation.]" (*Marshall*, *supra*, 15 Cal.4th at pp. 21, 23; *People v. Tena* (2007) 156 Cal.App.4th 598, 607.) All the facts surrounding a defendant's request for self-representation must "constitute an articulate and unmistakable invocation" of that right. (*People v. Danks* (2004) 32 Cal.4th 269, 297, citing *Marshall, supra,* 15 Cal.4th at p. 21.)

### 3. Background

On December 9, 2014, after the November 7, 2014 jury verdicts, the trial court received a letter written by defendant,[11] addressed to the trial court. In it, defendant stated he did not receive a fair trial because a witness was improperly coached and another witness testified falsely. Defendant complained his trial counsel failed to prove those witnesses "lied," failed to use defendant's notes during his cross-examination of those witnesses, "did not fight for [defendant's] innocence," and "was more a negotiator than anything else." Defendant claimed that at one point his trial counsel walked out on him and told him to find another lawyer, but defendant did not know how to get another lawyer so defendant allowed his trial counsel to continue to represent him which led to defendant receiving ineffective assistance of counsel. Defendant stated in the letter, "I needed help with a [l]awyer to represent me and I still do. [¶] I would please like to file motions for a [r]etrial with a [s]tate[-a]ppointed [l]awyer so we can look through my case and prove my innocence."

On January 8, 2015, the day set for a court trial on the prior conviction allegations and hearings on formal probation and sentencing, defendant and his counsel conferred off the record. Defendant's counsel said, "Your Honor . . . before we proceed, [defendant] is indicating to me that he would like the court to read a letter that he addressed to the court.

---

[11]  Defendant wrote the letter although he was represented by counsel. The record does not contain the original letter. The parties stipulated during record correction proceedings that a reproduction of the original letter accurately reflected its contents.

I've reviewed it. He is requesting pro per status to handle his case at this point on. [¶] Is that correct, [defendant]?" Defendant replied, "Yes, that's correct."

The trial court explained that it had received a handwritten letter purportedly prepared by defendant, but did not read it because it was an improper ex parte communication with the court. Upon the trial court's inquiry, defendant stated he wanted the trial court to read the letter. The trial court then stated, "Before I do that, [defendant], your attorney, at least at this time . . . has mentioned that you're making a request to represent yourself although at a late stage of the case. This is for sentence and trial on the prior convictions. Are you absolutely certain that is what you wish to do?" Defendant responded, "Yes. I wish to do that at this time, Your Honor."

The trial court continued, "Well, before I can approve your request, I have to make certain that you understand what you're getting yourself into and that you understand you still have a right to have counsel represent you at all critical stages of your case, including today's hearings. You need to understand that. More importantly, you need to waive and give up those rights. Those are constitutional protections that you have that. Evidently, you're willing to give up [those protections] and proceed on your own as your own counsel. [¶] You have to understand the pitfalls that you will certainly experience by representing yourself, and you will receive no assistance by anyone. You will not have co-counsel. You will not have an attorney [to] help you. You will not have the court's help. You're on your own. So, again, with that additional information, is it still your desire to go forward and represent yourself[?]" Defendant replied, "Yes, Your Honor."

The trial court then stated, "Okay. Well, I need for you to fill out certain documents before I proceed on that request. It's called a waiver of right to counsel and other things you need to understand and acknowledge. We'll have to recess for about . . . 15 minutes, to give [defendant] an opportunity to complete the *Faretta* waivers . . . ." After the recess, the trial court stated, "The court recessed the matter to allow [defendant] to complete a *Faretta* waiver advisement, waiver of right to counsel in order for the court to entertain his motion for pro per status and to represent himself from this point on albeit it's post-jury trial conviction." The trial court confirmed that

12

defendant signed the completed waiver of rights form. Defendant confirmed that he reviewed the document, "understood the rights that [were] mentioned on [that] document," and was "waiving and giving up those rights in order to represent [himself] as [his] own lawyer."

The trial court continued, "The consequences [of] you doing so, again, as I've mentioned earlier that you will receive absolutely no attorney assistance in this matter pertaining to the rules of law, rules of procedure that you'll be required to know and follow in order to represent yourself from this point on. [¶] Do you understand that?" Defendant replied, "Yes, I do, Your Honor."

The trial court then said, "Having all those consequences in mind, is it still your desire to waive your constitutional right to have counsel represent you free of charge?" Defendant responded, "Yes." The trial court accepted defendant's waiver and allowed defendant to proceed "as [his] own lawyer."

Immediately thereafter, defendant represented himself at the court trial on defendant's prior conviction allegations. At the conclusion of the court trial, the trial court found the prior conviction allegations true.

The trial court then asked defendant if he still wanted the court to read the letter, and defendant said he did. The trial court read the letter, and said, "You bring many issues to the court, one of which causes me concern because in the letter you are requesting the court appoint you counsel. Well, you've already given up your right to have an attorney so I cannot grant that request unless you wish to have an attorney represent you. But . . . you just had the court relieve [your] state-appointed lawyer . . . . So that is no longer an issue. You are on your own so whatever motion for retrial, as you're describing it, must be done by you. [¶] You understand that now; correct?" Defendant responded, "Yes, I do, Your Honor."

After a recess, the trial court appointed "standby counsel out of an abundance of caution in the event [defendant] changes his mind and chooses to exercise his right to have counsel despite his request, which was granted today to represent himself in pro per." Standby counsel was present and accepted the appointment. Defendant continued

13

to represent himself in two subsequent hearings and made several motions, including a motion for transcripts, a request for discovery, a motion for additional money for pro per funds, and a motion for a continuance.

### 4. *Analysis*

Defendant's request for self-representation was unequivocal. At the January 8, 2015, hearing, defendant was present and, after he and his counsel conferred off the record, defendant, through his counsel, requested to represent himself. The trial court confirmed the request directly with defendant. Thereafter, the trial court inquired of defendant whether he was "absolutely certain that he wanted to represent himself, and defendant said, "Yes. I wish to do that at this time, Your Honor."

The trial court, in making "certain" defendant understood what he was "getting [himself] into," explained the "pitfalls" of representing himself because he would not have "assistance by anyone"; he was "on [his] own" and would not have the assistance of an attorney. "With that additional information," the trial court asked defendant whether it was still his "desire to go forward and represent yourself[?]" Defendant replied, "Yes, Your Honor."

The trial court stated, in defendant's presence, it recessed the matter "to allow defendant to complete a *Faretta* waiver advisement, waiver of right to counsel in order for the court to entertain his motion for pro per status and to represent himself from this point on . . . ." Defendant initialed and signed the waiver of rights form.[12] He confirmed

---

[12] The waiver of rights form is included in the record on appeal and we have reviewed it. It is three pages long and divided into five somewhat self-explanatory sections—constitutional rights, personal information, dangers and disadvantages of self-representation, charges and consequences, and court's advice and recommendation. The form lists 28 advisements and instructs defendant to initial the box after each advisement only if he "understand[s] and agree[s] with it." At the end of the form, above his signature, is the following: "I hereby certify that I have read, understood and considered all of the above warnings included in this petition and I still want to act as my own attorney. I freely and voluntarily give up my right to have a professional attorney represent me."

14

he reviewed the document, "understood the rights that [were] mentioned on [the] document," and was "waiving and giving up those rights in order to represent [himself] as [his] own lawyer."

The trial court reiterated for defendant that "[t]he consequences" of his waiving his rights specified in the document was he would "receive absolutely no attorney assistance in this matter pertaining to the rules of law, rules of procedure that you'll be required to know and follow in order to represent yourself from this point on." In response to the trial court's inquiry, defendant again said that he "underst[ood] that." Defendant also confirmed, "Having all those consequences in mind, it [was] still [his] desire to waive [his] constitutional right to have counsel represent [him] free of charge."

Once the trial court read defendant's letter, the trial court noted the letter contained a request for state-appointed counsel and asked defendant if, despite the letter, he understood he was now on his own. Defendant said he understood he was on his own, made no objection to proceeding on his own, and made no request for substitute counsel. The trial court appointed "standby counsel" in the event defendant changed his mind and choose to exercise his right to have counsel, but there is no indication in the record defendant ever changed his mind and requested the appointment of counsel. Defendant continued to represent himself in two subsequent hearings, and the record does not show, at any time after the trial court granted defendant's request to represent himself, he requested the appointment of counsel.

The only request regarding representation defendant made in open court was for self-representation. Even after the trial court read defendant's letter, which it had received about one month before, defendant said he understood he was "on [his] own, and did not request the appointment of new counsel. Indeed, because the trial court appointed "standby counsel" in the event defendant changed his mind and choose to exercise his right to have counsel, the trial court was prepared to appoint standby counsel as defendant's counsel. That never occurred; defendant never changed his mind.

**D.    Correction Regarding Defendant's Actual Custody Credit**

A defendant is entitled to credit for all days in custody commencing with the day of arrest (*People v. Taylor* (2004) 119 Cal.App.4th 628, 645) and including partial days and the day of sentencing (*People v. Browning* (1991) 233 Cal.App.3d 1410, 1412; *People v. Fugate* (1990) 219 Cal.App.3d 1408, 1414). The trial court stated defendant was entitled to 787 days of presentence custody credits, consisting of 685 days of actual custody credit and 102 days of conduct credit.

Defendant however was arrested on May 23, 2013 and was in custody though his sentencing hearing on April 9, 2015—totaling 687 days of actual custody, not 685. Defendant is also entitled to good conduct credit computed at 15 percent of that actual time in custody. (§ 2933.1 ["any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 shall accrue no more than 15 percent of worktime credit"].) Defendant therefore is entitled to 103 days of conduct credit, not 102. Thus, the judgment should be modified, and the abstract of judgment must be amended, to reflect defendant is entitled to receive 790 days of presentence custody credits, consisting of 687 days of actual custody credit and 103 days of conduct credit.

# DISPOSITION

We reverse the portion of the judgment concerning the gang enhancement on the conviction for attempted murder of Campbell (count 1). The matter is remanded for the trial court to modify the judgment and amend the abstract of judgment to reflect defendant is entitled to receive 790 days of presentence custody credits, consisting of 687 days of actual custody credit and 103 days of conduct credit. The trial court is to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KUMAR, J.[*]

We concur:

TURNER, P. J.

BAKER, J.

---

[*] Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.