Filed 3/29/16  P. v. Love CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B252984 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA391059) |
| v. | |
| THADDEUS LOVE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Marc A. Kohm and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Defendant Thaddeus Love, a member of the Carver Park Crips criminal street gang, assembled a crew to commit a string of robberies in Los Angeles. One crew member, Randall Jackson, was a member of the Front Hood Crips, a gang friendly with the Carver Park Crips. Jackson eventually cooperated with the police in the investigation and prosecution of the robberies, providing a written statement that implicated Love in these crimes. This case involves Love's attempts to dissuade Jackson from being a witness in the robbery case.

Love participated in two principal acts that formed the basis of the prosecution in this witness intimidation case. First, he conspired with both his wife and a fellow gang member to deliver Jackson's written statement to the Front Hood Crips to prove that Jackson was a "snitch." Proof was necessary to prompt the Front Hood Crips to pressure Jackson not to cooperate with the prosecution of the robbery case. Second, Love attempted to undermine Jackson as a witness by having him write a letter that recanted and explained his incriminating statement as having been coerced by the police.

The prosecution charged Love with three counts: (1) conspiracy to dissuade a witness from testifying (Pen. Code,[1] §§ 136.1, subd. (a)(1), 182, subd. (a)(1); count 1); (2) attempting to dissuade a witness (§ 136.1, subd. (a)(2); count 2); and (3) dissuading a witness from prosecuting a crime (§ 136.1, subd. (b)(2); count 3). The prosecution also alleged a gang enhancement under section 186.22, subdivision (b)(1)(B), for all counts and further alleged that Love had suffered five prior strike convictions pursuant to sections 667, subdivisions (b) through (i), and 1170.12; two prior convictions pursuant to section 667, subdivision (a)(1); and five convictions pursuant to section 667.5, subdivision (b). A jury convicted him on all counts and found true the gang allegation on count 1 only. Love admitted his prior convictions and was sentenced to a prison term of 35 years to life.

---

[1] Statutory references are to the Penal Code, unless otherwise indicated.

On appeal, Love challenges the sufficiency of the evidence to support the convictions and contends that the trial court erred in instructing the jury, denying his right to self-representation, and admitting wiretap evidence used to convict him on the conspiracy charge in count 1. We affirm.

## FACTUAL BACKGROUND

### A. THE ROBBERIES

In January 2010, the Los Angeles Police Department (LAPD) was investigating a number of robberies. Love, Jackson, and others were suspects. During the investigation, LAPD detectives spoke with Jackson about their suspicions. Jackson, who was 16 years old at the time, provided an incriminating written statement that identified Love as having orchestrated the robberies (Jackson's statement). He also identified himself and Love in surveillance photographs taken of the robberies. Jackson was arrested for the robberies along with the other robbery suspects, including: Love, Willie Stigar, Angelo Wingo, and Devon Glover. Stigar was a member of Carver Park Crips; Wingo was a member of the Rolling 40's gang; and Glover was related to Stigar but not a gang member.

### B. THE CONSPIRACY TO DISSUADE JACKSON

After the arrest, the police obtained wiretap evidence that Love was working with Christy Bates, his wife, and Nichelle Jackson (Nichelle), a Carver Park Crips member, to deliver Jackson's statement to Husani "Papa" Acklin, a Carver Park Crips member and Love's long-time friend. In gang vernacular, any document showing a witness's cooperation with the police—such as Jackson's statement—is called "paperwork."

To obtain a copy of Jackson's statement, Love elected to represent himself during much of the robbery case. As a self-represented litigant, he was able to obtain this discovery from the prosecutor. The evidence at trial suggested that Love's decision to represent himself was part of his scheme to dissuade Jackson from cooperating as a government witness. In fact, he encouraged a fellow gang member to employ this same strategy in another pending criminal case. He wrote a jailhouse note, known as a "kite," to that incarcerated gang member encouraging him to represent himself so he could discover who was "snitching" on him.

3

After obtaining Jackson's statement, Love worked with Bates and Nichelle to deliver it to Papa. Through the use of the wiretap, the police recorded "jail text[s]" between Love and Bates about the paperwork. A "jail text" describes a form of messaging through an inmate's misuse of the outgoing collect call system. When the system prompts the inmate to provide his name so the recipient can decide whether to accept the call, the inmate leaves a brief message instead and receives a brief response from the recipient, who then hangs up. Jail texting avoids the jail's recording system, which only records a conversation following acceptance of the collect call.

On December 14, 2010, Love initiated jail texts with Bates using the telephone in the jail's library for self-represented litigants, which appeared to discuss Jackson's statement, or paperwork:

"Love:          What's up with [Nichelle]?"

"Bates:         I had to talk to her."

"Love:          Paper still ain't got over there."

"Bates:         They not answering."

The next day, on December 15, Love had a court appearance in the robbery case. Later that day, Bates left a voicemail message for Nichelle, stating: "[Nichelle], I left the papers . . . at Papa['s] house. I was calling you, you wasn't answering while I was over there so, I just left the papers with Papa, so, uh, give me a call, let me know when you grab them." Nichelle returned Bates's call minutes later, in which they discussed the paperwork from "[t]he boy who was talking from Front Hood [Crips]":

"Bates:         Hey, I just dropped the paper off at Papa['s] house. So hurry
                up and grab that shit too, before he start showing people and
                letting people fuck with it and all that.

"[Nichelle]:   Wait . . . what?

"Bates:         The paperwork for . . . the Front Hood niggas.

"[Nichelle]:   Well, who . . . on it?

4

"Bates: The boy who was talking from Front Hood. Remember you was saying that the niggas was saying that all he wanted was to see the paperwork?

"[Nichelle]: Oh, I . . . .

"Bates: That's what I was bringing you? [¶] . . . [¶]

"Bates: . . . Cause BA [Love] just trying to get some'n together. . . . [¶] . . . [¶]

"[Nichelle]: So what they got on my nigga?

"Bates: They really don't got nothing. . . .

"[Nichelle]: All they got is the boy's statement.

"Bates: Basically.

"[Nichelle]: Which is some bullshit. He lying.

"Bates: Exactly.

"[Nichelle]: Shit. I ain't got nothing to do with that man.

"Bates: Exactly.

"[Nichelle]: Wow. Dammit. Well yeah, I got one. So if you gave it to him, then shit, they all need to see it anyway. . . .

"Bates: Anybody . . . who know them niggas over there, man, tell them to put that shit . . . on the map."

Gangs strongly frown upon members who cooperate with the police. Those who "snitch" may be assaulted or killed. But before a gang will retaliate, there must be proof of "snitching"—i.e., "paperwork." In the case of Jackson's statement, gang protocol called for Love to provide the paperwork to the Front Hood Crips, Jackson's gang. Because the Carver Park Crips and Front Hood Crips were allied gangs, the Front Hood Crips would be responsible for taking care of Jackson. While in jail, Jackson was approached by fellow gang members who suggested that he not take the witness stand.

C.    THE ATTEMPT TO DISSUADE JACKSON FROM TESTIFYING

On February 6, 2012, Jackson wrote a letter to the prosecutor while in a courtroom holding cell with his codefendants. Jackson did not want to write the letter, but did so at

5

Love's request. Love gave Jackson a letter—along with paper and a pencil—and asked him to rewrite it so that it would be in his own handwriting. Jackson complied and returned the letter to Love.

In the letter, Jackson recanted his prior statement incriminating Love and falsely explained that the police had coerced him to write the statement. The letter read as follows:

"I, Randall Jackson, [am] writing this letter and complaint regarding a visit I got from Detective [Christopher] Hicks . . . . He also informed me if I want to get myself out of trouble, I need to help him. He want[s] me to lie and fabricate illegal testimony about defendant Love . . . .

"At that point, I told Detective Hicks I need to talk to him about these robberies. First, I told Detective Hicks I want to testify that I lied [about] defendant Love being involved in any robbery. I was young and scared, and I was trying to get myself out of trouble.

"I then informed him that I don't want to be in protective custody. My life is not in any danger. Nobody ever approached me about being a snitch. Only one person tried to persuade me into lying and testifying [and] that [is] Detective Hicks. Nobody made me write this letter.

"I will testify to these statements. I have never been threatened by anyone besides Detective Hicks. Hicks told me he needs me to lie and fabricate, lie on defendant Love if I want to go home."

At trial, Jackson testified that the contents of the February 2012 letter were false. The police had not coerced him to confess about the robberies or to implicate Love. He wrote the letter, as requested, because he felt "sorry" for Love and his "bad situation." Love did not threaten him to write the letter.[2]

---

[2]    That Jackson claimed not to be intimidated is not material to the charges, which focus on the perpetrator's intent rather than on the effect on the victim. (§ 136.1 [proscribing attempts to dissuade and requiring that defendant have specific intent]; compare, § 422 [requiring victim to be in sustained fear for crime of criminal threats].)

## DISCUSSION

Love raises four principal issues on appeal. First, he contends that the evidence was insufficient to support the convictions on all three counts. Second, he argues that the trial court erred in failing to instruct the jury on accomplice testimony and mistake of law. Third, he claims that the trial court deprived him of his right to meaningful self-representation. Fourth, he asserts that the admission of the wiretap evidence violated his rights under the Fourth and Fourteenth Amendments. Each of these contentions lacks merit.

### A. THE SUFFICIENCY OF THE EVIDENCE CHALLENGE

#### 1. *Jackson Is a Witness Within the Meaning of Section 136*

Love's challenge to the sufficiency of the evidence begins with a wholesale attack on all counts against him, asserting that Jackson cannot be considered a "witness" within the meaning of section 136, subdivision (2). This challenge raises a question of statutory interpretation, which we review de novo. (*People v. McGowan* (2015) 242 Cal.App.4th 377, 380 ["On appeal, questions of law and statutory interpretation are reviewed de novo"].) In construing a statute, we analyze the language to determine whether there is any ambiguity and only resort to interpretative aids, such as legislative history, if the statutory meaning is unclear. (*Ibid.*; accord, *People v. Robinson* (2010) 47 Cal.4th 1104, 1138.)

Section 136.1 broadly prohibits the intimidation of victims and witnesses by criminalizing conduct intended to obstruct justice. To that end, the statute proscribes acts taken for the purpose of preventing or discouraging a witness or victim from testifying at trial or other legal proceeding. (§ 136.1, subd. (a).) The statute also criminalizes intentional efforts to interfere with the criminal justice system by attempting to discourage a witness or victim from reporting a crime, initiating and assisting in a prosecution, or seeking an arrest. (§ 136.1, subd. (b).) Love asserts that Jackson was not a "witness" within the meaning of that statute because he did not fall within one of the "three categories of persons" protected by section 136.1—"(1) victim[s]; (2) witness[es]; (3) victimizer[s], perpetrator[s], charged codefendant[s]."

7

Love's argument flies in the face of the plain language of the statute.  Section 136, subdivision (2), defines the term "'[w]itness'" to include: "any natural person, (i) having knowledge of the existence or nonexistence of facts relating to any crime, or (ii) whose declaration under oath is received or has been received as evidence for any purpose, or (iii) who has reported any crime to any peace officer, prosecutor, probation or parole officer, correctional officer or judicial officer, or (iv) who has been served with a subpoena . . . , or (v) who would be believed by any reasonable person to be an individual described in subparagraphs (i) to (iv), inclusive."

Nowhere in the statutory definition did the Legislature draw the distinctions that Love seeks to create in this case—one that would categorically exclude from statutory protection anyone involved in the commission of the underlying crime.  On the contrary, the broad definition of "'[w]itness'" extends to such persons because they unquestionably "hav[e] knowledge of the existence or nonexistence of facts relating to the crime." (§ 136, subd. (2).)  Because Jackson knew firsthand about the robberies, he was a "witness" within the plain meaning of the statute.  (See *People v. McGowan*, *supra*, 242 Cal.App.4th at p. 380 [plain language controls statutory interpretation].)

2.     *Substantial Evidence Supports the Convictions*

Love next argues that, even if Jackson qualifies as a "witness" under section 136, subdivision (2), the evidence at trial was insufficient to support his convictions.  In considering a challenge to the sufficiency of the evidence, we review the entire record to determine if any rational jury could have found the elements of the crime or special allegation were proven beyond a reasonable doubt.  (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)  In performing this analysis, we evaluate the evidence in the light most favorable to the prosecution.  So long as there is substantial evidence to support the verdict, we must affirm.  (*Ibid.*)

a.     Conspiracy (Count 1)

The jury convicted Love of conspiring to prevent or dissuade a witness from testifying at trial.  (§§ 136.1, subd. (a)(1), 182, subd. (a)(1).)  Love contends that the evidence does not support the conclusion that he entered into such an agreement.

8

A conspiracy is an agreement between two or more people to "commit any crime." (§ 182, subd. (a)(1).) "The crime of conspiracy punishes the agreement itself and 'does not require the commission of the substantive offense that is the object of the conspiracy.' [Citation.]" (*People v. Johnson* (2013) 57 Cal.4th 250, 258.) Proof of the agreement may be shown through direct or circumstantial evidence. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1025 ["To prove an agreement, it is not necessary to establish the parties met and expressly agreed"].) Circumstantial evidence includes "'the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.)

The circumstantial evidence supports the jury's finding that Love had reached an agreement with Bates to prevent or dissuade Jackson from testifying in the robbery trial. A reasonable interpretation of the jail texting between Love and Bates is that the two previously had agreed to a plan to deliver the paperwork to Papa. In the jail texts, Love appeared to be following up on the agreement, asking Bates why Nichelle had not yet delivered the paperwork to Papa. He noted that the "[p]aper still ain't . . . over there" and asked: "What's up with [Nichelle]?"

The day after this exchange, Bates called Nichelle about the paperwork for "[t]he boy who was talking from Front Hood [Crips]." They discussed the importance of Jackson's statement to the prosecution of the robbery case, stating: "All they got is the boy's statement." Bates reminded Nichelle of their prior discussion in which Nichelle mentioned that the Front Hood Crips had asked "to see the paperwork." Bates stated that she had "just dropped the paper off at Papa['s] house" after previously trying to bring it to Nichelle. Bates urged Nichelle to retrieve the documents from Papa before "he start[s] showing [it to] people and let[s] people fuck with it."[3] Bates also disclosed Love's

---

[3]     The police also discovered a note in Bates's house that stated: "Talked to [Nichelle] . . . . Get numbers and papers bac[k]." The prosecution's gang expert explained that Bates, after providing proof of Jackson's statement, would seek the return of the paperwork to conceal this evidence of witness intimidation.

9

participation in this scheme, stating that she was trying to bring Jackson's statement to her because Love was "trying to get [something] together."

In short, Love's statements in the jail texting with Bates provided independent proof of his participation in the conspiracy. The content of those statements revealed a joint effort to deliver the paperwork; and the manner in which his statements were made, by means of jail texting, reflected a strategy to conduct this concerted activity outside the reach of the police. Under the hearsay rule, the jury was then free to consider the extrajudicial statements of his alleged coconspirators (Bates and Nichelle). (Evid. Code, § 1223; accord, *People v. Herrera* (2000) 83 Cal.App.4th 46, 63 ["In order for a declaration to be admissible under the coconspirator exception to the hearsay rule, the proponent must proffer sufficient evidence to allow the trier of fact to determine that the conspiracy exists by a preponderance of the evidence"].) Taken together, the evidence was sufficient to allow a reasonable jury to conclude that Love had entered into an agreement with Bates and Nichelle to commit the target crime (i.e., dissuading a witness from testifying) as charged in count 1.

b.    Attempting To Dissuade a Witness from Testifying (Count 2)

Based on the letter that he provided to Jackson while the two were in a holding cell, Love was convicted of attempting to prevent or dissuade a witness from testifying at a legal proceeding, as charged in count 2. On appeal, he contends that the evidence at trial did not support his conviction for two reasons.

First, he claims that the evidence would only support a conviction under section 137, subdivision (c), and not under section 136.1, subdivision (a)(2). Section 137, subdivision (c), provides: "Every person who knowingly induces another person to give false testimony . . . is guilty of a misdemeanor." Section 136.1, subdivision (a)(2), prohibits anyone from "[k]nowingly and maliciously attempt[ing] to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." (See *People v. Womack* (1995) 40 Cal.App.4th 926, 931 [comparing the two statutes and noting that "[p]reventing or dissuading a witness from

10

testifying altogether is incompatible with influencing or shaping the testimony the witness gives"].)

Love argues that the contents of the letter demonstrate only an attempt to induce Jackson to testify falsely, not to prevent him from testifying altogether, because the letter concludes by stating that "[he] will testify to these statements." In evaluating the letter, however, the jury was not required to take its contents—including the offer to testify—at face value. The jury properly could consider the context of the letter and conclude that the letter was a sham created by Love for purposes of obstructing the robbery prosecution. More specifically, the jury reasonably could conclude that Love intended that the letter either would discourage Jackson from testifying or would prevent the prosecution from calling him as a witness by seriously damaging Jackson's credibility. Under this interpretation, which the evidence amply supports, the offer to testify was less than genuine.

        c.      Attempting To Dissuade a Witness from Assisting in the Prosecution of the Uncharged Robberies (Count 3)

In count 3, Love was charged with violating section 136.1, subdivision (b)(2), which prohibits any attempt to discourage a victim of or witness to a crime from "[c]ausing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof." (§ 136.1, subd. (b)(2).) When Love met with Jackson in the holding cell and handed him the February 6, 2012 letter to rewrite, Jackson had been speaking to the police about both charged and uncharged robberies. At trial, the prosecution argued that this count addressed an attempt to dissuade Jackson from cooperating with the police about uncharged robberies for which Love had not yet been arrested.

According to Love, the prosecution's theory is "foreclosed" by the decisions in *People v. Hallock* (1989) 208 Cal.App.3d 595, 605-607 (*Hallock*) and *People v. Fernandez* (2003) 106 Cal.App.4th 943, 950 (*Fernandez*), which concluded "that section 136.1, subdivision (b) punishes a defendant's pre-arrest efforts to prevent a crime from being reported to the authorities." (*Fernandez*, *supra*, at p. 950.) Love conclusorily

11

asserts that the jury reasonably could not find him guilty of any pre-arrest dissuasion because he already had been arrested by the time he gave the February 6, 2012 letter to Jackson. This assertion, however, ignores the fact that he was a suspect in uncharged robberies that were still under investigation.

This distinguishes *Hallock* and *Fernandez*. In *Hallock*, the defendant attempted to rape a woman and then threatened to blow up her house if she reported the crime. Although the defendant was charged with attempting to dissuade a witness from reporting a crime (§ 136.1, subd. (b)(1)), the trial court erroneously instructed the jury on the elements necessary to prove an attempt to dissuade a witness from testifying at a legal proceeding (§ 136.1, subd. (a)(1)). The prosecution sought to salvage the conviction on the charged offense by arguing that there was no error since the threat qualified as a crime under both subdivision (a) and subdivision (b). The court rejected this argument, concluding that the "threat could only reasonably have been believed to have been directed at reporting the crime to the police," and that it was unreasonable to believe that the "defendant was concerned with testimony at a future trial for a crime for which he had not yet been arrested." (*Hallock*, *supra*, 208 Cal.App.3d at p. 607.)

In *Fernandez*, the defendant was charged with forgery and grand theft and attempted to persuade the victim to testify falsely at the preliminary hearing. For that attempt, the prosecution added a charge under section 136.1, subdivision (b)(1), which criminalizes attempts to dissuade a crime victim or witness from "[m]aking any report of that victimization to any peace officer . . . or prosecuting agency or to any judge." The prosecution argued that section 136.1, subdivision (b)(1), applied because it "can be interpreted to include an effort to dissuade a report made under oath to a judge at a preliminary hearing; i.e., to prevent or influence a witness's anticipated testimony at a preliminary hearing." (*Fernandez*, *supra*, 106 Cal.App.4th at p. 947.) The court disagreed, stating: "We agree with *Hallock*'s conclusion that section 136.1, subdivision (b) punishes a defendant's pre-arrest efforts to prevent a crime from being reported to the authorities." (*Id.* at p. 950; but see *People v. Velazquez* (2011) 201 Cal.App.4th 219, 232 ["To the extent the court in *Fernandez* intended to include

12

subdivision (b)(2) [of section 136.1] in its statement that subdivision (b) applies only to prearrest attempts to dissuade the reporting of a crime, the statement is dictum, with which we respectfully disagree"].)

*Hallock* and *Fernandez* do not address the circumstances, and thus cannot possibly foreclose the outcome, in this case. Jackson was cooperating with the police in prosecuting filed charges and in investigating unfiled charges. The facts presented to the jury support the conclusion that Love intended not only to derail the ongoing prosecution of the pending charges, but also to thwart the potential prosecution of additional charges. Thus, substantial evidence supports the conviction on count 3 for a violation of section 136.1, subdivision (b)(2).

**B.      THE ALLEGED INSTRUCTIONAL ERROR**

Love claims that the trial court had a sua sponte obligation to instruct the jury on the need for corroboration to support the testimony of an accomplice and on the mistake of law defense. Even without a defense request, a trial court must instruct on accomplice testimony if the evidence supports giving those instructions. (*People v. Tobias* (2001) 25 Cal.4th 327, 331.) We assume, without deciding, that a similar obligation applies to a mistake of law defense. (But see *People v. Lawson* (2013) 215 Cal.App.4th 108, 111 ["the trial court did not have a duty to instruct on the [mistake of fact] defense sua sponte, or on any other defense that served only to negate the intent element of the charged crime"].)

1.      *Failure To Instruct on Accomplice Testimony*

According to Love, "Jackson was an accomplice twice over"—by participating in the robberies and by writing the letter he received from Love. After characterizing Jackson as an accomplice, Love concludes that the trial court erred in failing to instruct the jury on the need for corroboration of accomplice testimony. (CALJIC No. 3.11 [corroboration required for accomplice testimony to be considered]; CALJIC No. 2.27 [accomplice testimony falls outside the general rule of sufficiency of single witness testimony].) This conclusion is built on a faulty premise.

13

A conviction cannot be based upon an accomplice's uncorroborated testimony. (§ 1111.) "An accomplice is . . . defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid*.) Under a straightforward application of this statutory definition, Jackson was not an accomplice to the crimes charged in this case. While his participation in the robberies made him an accomplice in any prosecution of those crimes, Jackson's status as an accomplice is not an indelible mark that accompanies him wherever he goes. It follows him only so far as the prosecution takes him to procure a conviction on the robbery offenses. (See *ibid*.)

Nor is Jackson an accomplice in this case because he rewrote the letter he received from Love. Jackson testified that Love presented the letter to him while they were in a courthouse holding cell together, along with paper, pencil, and an envelope. The two had not previously spoken about the letter, and Jackson did not want to rewrite it. The fact that Jackson agreed to do so because he "felt sorry for [Love]" does not make Jackson an accomplice. By rewriting the letter in these circumstances, Jackson could not have been criminally liable for attempting to persuade *himself* not to testify in the robbery trial and not to cooperate with the police in pursuing the potential prosecution of additional robbery charges. (See *People v. Carrington* (2009) 47 Cal.4th 145, 191 ["Providing assistance without sharing the perpetrator's purpose and intent is insufficient to establish that a person is an accomplice"].)

Because Jackson was not an accomplice within the meaning of section 1111, the court did not err in failing to instruct on accomplice testimony. That is, the court was not required to give CALJIC No. 3.11 (accomplice testimony) and modify CALJIC No. 2.27 (single witness testimony), as Love contends on appeal. This conclusion also disposes of Love's related contention that the prosecution failed to present sufficient evidence to corroborate Jackson's testimony.

2.    *The Failure To Instruct on Mistake of Law*

"It is well settled that a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense for which the record contains

14

substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case [citation]." (*People v. Salas* (2006) 37 Cal.4th 967, 982.) The trial court did not violate these principles in failing to instruct the jury on mistake of law here.

Love claims that that the circumstantial evidence supported a mistake-of-law defense. Addressing the wiretap evidence, he argues that the jury could have concluded that he was attempting to disseminate the paperwork to show that, although he was in protective custody, he was not a "snitch." That is, the two principal reasons for being placed in protective custody is to protect child molesters and "snitches," and since Love was not a child molester, he might worry that he would be viewed as a "snitch." The paperwork would show that it was Jackson, and not Love, who was the "snitch." As for the letter, Love argues that he honestly may have believed that it was lawful "to influence favorable testimony by a codefendant" or that it was a proper "defense tactic to ameliorate Jackson's inculpatory confession." None of these arguments has any merit.

"Mistake of law is a defense where the mistake negates the specific intent required for the crime." (*People v. Flora* (1991) 228 Cal.App.3d 662, 669.) To warrant an instruction on this defense, however, the evidence must "support[] a reasonable inference that the claimed mistake was held in good faith." (*Ibid*.) There is no direct evidence of his thoughts because Love did not testify at trial. This leaves him to rely on circumstantial evidence that is so meager that it allows only for speculation. The connection between being in protective custody and obtaining Jackson's paperwork is weak: it would not rule out the possibility that Love is also a "snitch"; and it would not explain why Love was in protective custody if he was neither a "snitch" nor a child molester. Weaker still is his speculation about what might have been running through his mind when he confronted Jackson in the holding cell with the fraudulent letter. It is, to say the least, a stretch to suggest that Love had a good faith belief that he was engaging in a legally permitted defense. Even one not trained in the law surely knows that the fabrication of false evidence crosses all legal bounds.

15

Moreover, even if the trial court had erred in failing to instruct on mistake of law, any error was harmless under the most stringent standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705] [inquiring whether error was harmless beyond a reasonable doubt]; see *People v. Salas*, *supra*, 37 Cal.4th at p. 984 [noting that the applicable test of prejudice is unclear].) The evidence strongly showed a full-court press to eliminate or neutralize Jackson as a witness against Love by surreptitiously conspiring to expose him as a snitch and by undermining his credibility if the conspiratorial tactics were not sufficient to frighten him away. Moreover, if the jury had believed that Love was only trying to deliver Jackson's paperwork to Papa to explain his placement in protective custody, they would have acquitted him on the conspiracy charge because he would have lacked the specific intent necessary to commit the target offense. Thus, the jury plainly concluded that Love's intent was to dissuade or intimidate a witness.

## C.    THE ALLEGED DEPRIVATION OF THE RIGHT TO SELF-REPRESENTATION

Love next contends that the trial court violated his Sixth Amendment right to self-representation by restricting the privileges he would receive if he opted to represent himself without affording him a hearing. This contention lacks merit.

### 1.    *The* Faretta *Hearing*

On June 11, 2012, the trial court heard Love's motion to exercise his right to self-representation as set forth in *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (*Faretta*). After confirming that Love intended to represent himself and that he had completed a *Faretta* waiver form, the trial court began to address the restrictions it would impose based on the allegations of witness intimidation.

The trial court noted that, in view of the holding order following the preliminary hearing, there was probable cause to believe that Love had used his jail privileges as a self-represented litigant in the robbery case to try to intimidate Jackson and frustrate his ongoing cooperation with the police and the prosecution. The trial court then explained that Love would thus not receive the same privileges he previously had if permitted to represent himself here. As the court was explaining the restrictions, Love asked: "When

16

you say take my privileges away, you mean no phones?" The court responded: "You have regular phone privileges just like every other inmate. You would not have access to the law library. You would get a [propria persona] kit, but you would not have library and phone privileges." Love then immediately stated: "Then I don't . . . want to be pro per."

2.    *Legal Analysis*

A criminal defendant's right to self-representation has been firmly established since *Faretta*. A necessary corollary to this Sixth Amendment guarantee is that a defendant must be provided access to resources sufficient to permit an adequate defense. (*People v. Moore* (2011) 51 Cal.4th 1104, 1124 ["We have held, as a general rule, that the federal and state constitutional provisions concerning the assistance of counsel for criminal defendants include the right to access '"reasonably necessary defense services"'"].)

However, neither the right to self-representation nor the accompanying privileges are absolute: the right can be revoked and the privileges can be restricted if abused. (*Faretta*, *supra*, 422 U.S. at p. 834, fn. 46 [revocation]; *People v. Moore*, *supra*, 51 Cal.4th at p. 1125.) In deciding whether there is cause to restrict or terminate privileges, a trial court generally must provide the defendant with notice and a hearing. (*Moore*, *supra*, at pp. 1125-1126.) The specific process due will depend on the circumstances. For instance, if the restrictions result from a defendant's malfeasance in jail requiring confinement that limits movement and access to privileges, an administrative disciplinary proceeding with an opportunity for the defendant to be heard at a subsequent court hearing may be sufficient. (*Id.* at p. 1126; cf. *People v. Carson* (2005) 35 Cal.4th 1, 11 ["Because circumstances will vary with the facts of each case, we leave to the trial court's discretion the ultimate decision as to how best to proceed in making an appropriate record [when evaluating whether to revoke the right to self-representation based on conduct outside the courtroom"].)

Here, Love claims that the trial court deprived him of the right to be heard before restricting telephone and library privileges otherwise given to a self-represented litigant.

17

The question, for purposes of due process, is whether the trial court afforded him a meaningful opportunity to challenge the factual basis for restricting the privileges. (See *People v. Moore*, *supra*, 51 Cal.4th at p. 1126 ["there was substantial evidence supporting a finding of cause for restricting defendant's privileges (his possession of a sharpened prisoner-made weapon constituted a threat to jail security); defendant was provided with notice and a hearing before disciplinary sanctions were imposed; and the trial court reviewed the matter when defendant asked the court to override the restrictions"]; *People v. Carson*, *supra*, 35 Cal.4th at p. 11 ["it is incumbent on the trial court to document its decision to terminate self-representation with some evidence reasonably supporting a finding that the defendant's obstructive behavior seriously threatens the core integrity of the trial"].)

In this case, it was the allegations in the information that prompted concerns about the need to restrict jail privileges. The People charged Love with crimes of witness intimidation, which he sought to perpetrate by exploiting the privileges of self-representation. There was probable cause to believe that he elected to represent himself in the robbery case to obtain Jackson's statement for criminal purposes and that he attempted to carry out his conspiratorial scheme by abusing the telephone and library privileges he received as a self-represented litigant. Love had an opportunity to contest the sufficiency of the evidence to support those charges at the preliminary hearing and then subsequently by filing a motion to set aside the information. (§ 995.)[4]

On appeal, Love does not explain why the preliminary hearing and the right to file a motion to set aside the information were inadequate procedural safeguards to protect his right to challenge the factual basis for the trial court's decision to impose restrictions. Love did not request any further process, and he has not shown how another hearing

---

[4]     Love failed to provide the entire preliminary hearing transcript on appeal. The portion we did receive, however, contains evidence of the wiretap and Jackson's statement. That evidence is also discussed in the papers supporting and opposing Love's motion to set aside the information.

18

could have served any meaningful purpose. Love suggests that a hearing was necessary to address numerous unanswered questions, such as: "[W]hat is the precise misconduct . . . ? How [did] the misconduct threaten[] to impair the trial's core integrity? . . . Did the misconduct occur while defendant was represented by counsel? . . . Was defendant warned such misconduct might forfeit *Faretta* rights? Were other sanctions available?"

But the holding order following the preliminary hearing adequately resolved these issues for purposes of evaluating the need for restricted privileges. The court found probable cause to believe that Love had engaged in criminal acts of witness intimidation based on compelling and largely incontrovertible facts, including wiretap evidence and the letter that he had written for Jackson. This evidence demonstrated that Love had recently exploited the right to self-representation for purposes of subverting the judicial process. Few abuses of the right of self-representation are more egregious than its invocation for purposes of obstructing justice. (*People v. Carson*, *supra*, 35 Cal.4th at p. 9 ["One form of serious and obstructionist misconduct is witness intimidation, which by its very nature compromises the factfinding process and constitutes a quintessential 'subversion of the core concept of a trial'"].) In these circumstances, we cannot say that the trial court abused its discretion in deciding to restrict Love's privileges as a self-represented litigant in the subsequent witness intimidation case rather than warn him or impose alternative sanctions. (See *id.* at p. 6 [abuse of discretion standard applies to trial court's decision to terminate the right to self-representation for misconduct].)

Next, Love contends that the trial court violated his right to self-representation by restricting his privileges without offering to appoint advisory counsel for him. When restricting a defendant's privileges, a trial court should consider whether "other reasonable resources [should be provided to allow the defendant to] present his defense," such as the appointment of advisory counsel, an investigator, and a legal runner. (*People v. Moore*, *supra*, 51 Cal.4th at p. 1126.) The resources that must be made available depends on the particular case, including the facts requiring the restrictions in the first place. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1040 ["It is certainly true that a

19

defendant who is representing himself or herself may not be placed in the position of presenting a defense without access to a telephone, law library, runner, investigator, advisory counsel, or any other means of developing a defense [citation], but this general proposition does not dictate the resources that must be available to defendants"].)

Contrary to Love's contention, a trial court is not necessarily required to appoint advisory counsel in a noncapital case whenever a self-represented litigant is denied access to a law library. (*People v. James* (2011) 202 Cal.App.4th 323, 337 ["Nor are we convinced . . . that a pro se defendant *must* be appointed advisory counsel if he does not have personal access to a law library"], fn. omitted.) And even if this were required, Love has failed to demonstrate that the trial court refused to make such an appointment. The burden is on a defendant to demonstrate that he was denied reasonable access to resources and that the denial was prejudicial. (*People v. Blair* (2005) 36 Cal.4th 686, 736 ["To the extent [the] defendant may have been denied access to any resources, the denial was minimal and [the] defendant has failed to demonstrate any resulting prejudice"].); *James*, *supra*, at p. 335 ["To be entitled to a reversal, a defendant must show both error and resulting prejudice"].)

Love has not satisfied his burden here. The trial court did not indicate that it would deny Love all privileges, only those that he had abused to further his criminal objective. As the court was advising him of the restrictions, Love asked: "When you say take my privileges way, you mean no phones?" The court explained that Love still would have "regular phone privileges" and would get "a pro per kit," but that he "would not have access to the law library." Love responded: "Then I don't . . . want to be pro per." Love's response was immediate and unequivocal, indicating that his decision to represent himself depended firmly on his ability to obtain personal access to the law library along with the attendant telephone privileges. He did not request the appointment of advisory counsel or inquire whether there would be any other restrictions.

Love has not shown that he was forced to waive his right to self-representation because "[he] was presented with an unmeaningful choice where he could represent himself, but only if he forfeited his . . . law library access and phone privileges." "It is

20

settled that while self-represented inmates may not be deprived of all means of preparing a defense, the Constitution does not require *personal* access to legal resources." (*People v. Butler* (2009) 47 Cal.4th 814, 827.) And it simply cannot be said that Love was denied privileges that he never requested. There is no reason to believe that the trial court would have denied his request for advisory counsel or other reasonable resources (e.g., a legal runner and an investigator) if he had asked. Having failed to demonstrate that the trial court deprived him of a reasonable opportunity to represent himself, Love is not entitled to reversal of his convictions. (*Id.* at pp. 824-825 [erroneous denial of self-representation right is reversible per se].)

**D.      THE DENIAL OF THE MOTION TO SUPPRESS THE WIRETAP EVIDENCE**

As part of an investigation into widespread criminal activity by the Carver Park Crips, the prosecution obtained two wiretap orders. One of those orders authorized the monitoring of a cell phone that Bates used when jail texting with Love and speaking with Nichelle about the paperwork that proved Jackson's cooperation with the police. Love contends that this wiretap evidence should have been excluded from trial because it was obtained in violation of his Fourth and Fourteenth Amendment rights.

1.      *The Relevant Proceedings*

In 2010, the Los Angeles Sheriff's Department (LASD) was investigating the murder of Michael Owens and other crimes, including robberies and residential burglaries, which it believed had been committed for the benefit of the Carver Park Crips. On December 6, 2010, LASD Detective Hicks submitted a 64-page affidavit in support of an application for a wiretap order, Wiretap No. 10-231, which incorporated the facts set forth in a prior wiretap application that a judge had approved in September 2010, Wiretap No. 10-184. The application sought to monitor several telephones, including a cell phone used by Bates that was identified as "Target Telephone #10" (hereinafter, Bates's cell phone).

The wiretap application described a rash of serious crimes that had been committed, including a series of shootings between two rival gangs—the Carver Park Crips and West Side Piru. On January 24, 2009, two members of West Side Piru were

21

shot, and six hours later two members of Carver Park Crips were shot. No arrests were made for these shootings. The next day, an individual associated with Carver Park Crips was shot and killed. Two West Side Piru members were arrested and prosecuted for the murder. The day after the murder, Michael Owens was killed when two cars pulled alongside him on the street and two African-American males exited one of the cars and shot him. Owens was not a gang member, but was in West Side Piru territory when murdered. Two Carver Park Crips members were believed to have participated in the Owens murder.

The police also were investigating, and had evidence that members of the Carver Park Crips had committed, the following additional crimes: an attempted residential burglary in July 2009; an armed robbery at a cellular telephone store on October 15, 2009; an attempted armed robbery of another cellular telephone store that involved an exchange of gunfire on October 16, 2009; an armed robbery at a McDonald's restaurant, which appeared to involve Love (who was communicating by cell phone with a fellow gang member inside the restaurant during the robbery), in November 2009; a residential burglary on August 17, 2010; and a residential burglary on August 23, 2010.

The police believed that Love was a "'shot caller,'" or leader, in the Carver Park Crips. Evidence obtained from the previous wiretap order implicated Love in the Owens murder. Love was married to Bates, a Carver Park Crips associate. On July 7, 2010, Bates spoke by cell phone with Love while he was in jail on the robbery case. During that call, Love and Bates spoke in code. Love appeared to ask Bates about the location of a gun and if she had searched a vehicle for contraband. He then asked her to arrange for a three-way call with a fellow gang member, Toyrion Green, during which they appeared to discuss guns and possibly a prior shooting. After listening to this call, Detective Hicks followed up to see if Bates used the same cell phone after the July call. During a call on August 10, 2010, Love told Bates to discard her cell phone, but she declined to do so and continued to use it. Bates repeatedly exchanged calls with Green in September and October 2010, until he was arrested for residential burglary in early November. And Love, while in jail, apparently placed more than 800 calls to Bates on that cell phone. In

Detective Hicks's opinion, Bates was receiving orders from Love to assist in criminal activity.

The application also described the necessity for the wiretap order. It explained that numerous other investigative techniques had been used or were determined to be impracticable, including surveillance, interviews, confidential informants and undercover agents, search warrants, probation/parole searches, closed circuit television monitoring, pen registers, GPS tracking, grand jury empanelment, and trash searches. Despite having exhausted all reasonably available techniques, the police were not able to solve the crimes being investigated. The use of wiretap evidence would allow the investigators to learn directly about the criminal activity of the Carver Park Crips gang, including the Owens murder.

On December 6, 2010, Judge Larry Fidler signed the order authorizing Wiretap No. 10-231. That order authorized the monitoring of Bates's cell phone, which led to the discovery of evidence of witness intimidation. Before trial, Love moved to exclude that evidence on the grounds that the application for the wiretap order failed to establish probable cause and necessity.

The court conducted an evidentiary hearing. At the hearing, Detective Hicks and another law enforcement officer testified. Detective Hicks admitted that his application contained a few mistakes. Most significantly, the application erroneously stated that Bates's cell phone was used to speak with Love on the July 7th call, when Bates actually used her mother's telephone for that call. Detective Hicks explained that Bates had spoken with Love that day and asked him to call her on her mother's telephone because she was charging her cell phone. Detective Hicks testified that his incorrect description of the telephone used on July 7th was unintentional.

The trial court denied the motion to suppress the wiretap evidence and made three findings relevant to this appeal. First, the court found that the mistake in describing the telephone used for the July 7th call was neither intentional nor reckless. Second, the court found that there was probable cause to sign the wiretap order based not only on the July 7th call, but also "given the use of the target telephone by Ms. Bates to make other

contacts with potential coconspirators, and the discussions about dumping phones and using other phones." Third, the court found that there was a sufficient showing of necessity to monitor Bates's cell phone, stating that Detective Hicks reasonably explained why alternative law enforcement methods "would not achieve the goals of the investigation."

    2.    *The Legal Challenge*

Under California law, a judge may authorize "the interception of a wire or electronic communication" (i.e., a wiretap) (§ 629.50) if supported by a proper application that enables the judge to make specified findings of probable cause and necessity. (§§ 629.50, 629.52.)[5] On appeal, Love challenges the trial court's findings that there was an adequate showing of probable cause and necessity. In our review, "we defer to the court's express or implied factual findings if they are supported by substantial evidence," though we consider de novo whether the wiretap search complied with the Fourth Amendment and applicable state and federal law. (*People v. Jackson*, *supra*, 129 Cal.App.4th at p. 146, fn. omitted; accord, *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1055.)

Love raises two principal arguments in challenging the trial court's ruling. First, he claims that the wiretap order was not supported by probable cause because the relevant information in the application was stale and otherwise insufficient. In asserting staleness, Love argues that the probable cause determination relied on the July 7th call, which was

---

[5]    "Section 629.52 provides the judge must find: '(a) There is probable cause to believe that an individual is committing, has committed, or is about to commit [one or more listed crimes including murder]. [¶] . . . [¶] (b) There is probable cause to believe that particular communications concerning the illegal activities will be obtained through that interception . . . . [¶] (c) There is probable cause to believe that the facilities from which [the communications] are to be intercepted are being used, or are about to be used, in connection with the commission of the offense . . . . [¶] (d) Normal investigative procedures have been tried and have failed or reasonably appear . . . to be unlikely to succeed if tried or to be too dangerous.'" (*People v. Jackson* (2005) 129 Cal.App.4th 129, 144-145, fn. 13.) Another crime listed under the wiretap statute is any gang-related felony. (§ 629.52, subd. (a)(3) [listing "[a]ny felony violation of Section 186.22"].)

24

several months old at the time. But whether information is stale depends on numerous factors, including whether "there is reason to believe that criminal activity is ongoing." (*People v. Carrington*, *supra*, 47 Cal.4th at p. 164; see, e.g., *U.S. v. Harris* (11th Cir. 1994) 20 F.3d 445, 451 ["Because the affidavit alleged ongoing activity and a continuing relationship between coconspirators, the [two-year old] information was not fatally stale"].) Given the nature of the criminal activity under investigation—gang-related murder, attempted murder, robberies, and residential burglaries spanning a substantial period of time—it was reasonable to conclude that the Carver Park Crips had not ceased this behavior prior to the wiretap application in December 2010.

Thus, the probable cause analysis properly considers the July 7th call along with the other information in the application. The application described gang-related criminal activity involving Love and Bates and provided evidence that the two used Bates's cell phone to communicate between themselves and with other gang members about that activity. Hundreds of calls were placed to that cell phone from the jail where Love was housed. In previously intercepted calls, Love and Bates appeared to discuss guns, contraband, and a shooting. They also attempted to conceal their activities by speaking in code, and Love advised Bates to discard her cell phone. Under the totality of the circumstances, there was probable cause to believe that communications about gang-related felonies had been and would continue to be made over Bates's cell phone.[6]

Second, Love contends that the wiretap application did not make an adequate showing of necessity. The necessity requirement exists to guard against the routine use of wiretapping in criminal investigations. (*People v. Leon* (2007) 40 Cal.4th 376, 385.) To satisfy this requirement, the applicant must demonstrate that ordinary investigative

---

[6] Love claims that, under *Franks v. Delaware* (1978) 438 U.S. 154 [98 S.Ct. 2674, 57 L.Ed.2d 667], we must disregard the information obtained from the July 7th call—which he describes as "the linchpin of probable cause"—because he proved that Detective Hicks acted recklessly in stating that the call was made to the Bates's cell phone. But the trial court found otherwise, and we are bound to accept that finding because it is supported by substantial evidence.

techniques likely will be unavailing. This burden does not require "that law enforcement officials exhaust every conceivable alternative before seeking a wiretap." (*Ibid.*) "'[A] finding of necessity by the judge approving the wiretap application is entitled to substantial deference.' [Citation.]" (*People v. Sedillo*, *supra*, 235 Cal.App.4th at p. 1056.)

Here, Detective Hicks described both the investigative techniques used and those contemplated but ruled out as not viable. Love conclusorily asserts that this description contains only "[b]oilerplate conclusions and generalized [descriptions]." This is not an accurate characterization of the 21 pages of information addressing necessity in the wiretap application, which provide facts about the investigative methods previously used and reasons why further methods, short of wiretapping, would not be fruitful. Love also argues that Detective Hicks's statement that he might try surveillance after obtaining wiretap approval defeats the claim of necessity because it shows the existence of another viable investigative tool. The necessity requirement, however, does not impose a rigid order of investigation requiring the wiretap applicant to exhaust every other possible method. (*People v. Leon*, *supra*, 40 Cal.4th at p. 385.)[7]

Thus, Love has not demonstrated that the trial court erred in denying the motion to suppress the wiretap evidence used in this case. The wiretap application was adequately supported by facts establishing probable cause and necessity.

---

[7] Love argues that Detective Hicks's admission that he did not have probable cause to search Bates's residence shows the absence of necessity. Though unclear, the argument appears to be that if there was no probable cause to search Bates's residence, then the police should not be allowed to use the more intrusive wiretap technique. But the fact that Bates's residence may not have contained evidence or contraband should not foreclose the use of a wiretap for which there was probable cause.

## DISPOSITION

The judgment is affirmed.


BLUMENFELD, J.[*]


We concur:


ZELON, Acting P. J.


SEGAL, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.